FEDERAL MANAGEMENT SYSTEMS, INC., Plaintiff,

v.

The UNITED STATES, Defendant.

No. 04–295C.

United States Court of Federal Claims.

July 20, 2004.

Keith Calhoun–Senghor, Washington, DC, for plaintiff. Sharon White Senhor, of counsel.

David B. Stinson, Washington, DC, with whom was Assistant Attorney General Peter D. Keisler, for defendant. Douglas Kornreich and Krystal A. Jordan, Office of Coun-

sel, Department of Health and Human Services, of counsel.

## *OPINION*

CHRISTINE O.C. MILLER, Judge.

This case is before the court after argument on plaintiff's motion for summary judgment and defendant's cross-motion for judgment on the administrative record. Plaintiff submitted a proposal to the Government to compare the cost of a private-sector entity providing support services with the cost of agency personnel providing those services. As part of the evaluation process, plaintiff's proposal was found to be technically unacceptable; therefore, consideration of the proposal did not advance to a cost comparison. Plaintiff alleges that members of the evaluation board held positions covered by the proposal, manifesting a conflict of interest when they determined that plaintiff's proposal was technically unacceptable. The issue before the court after oral argument is whether the composition of the selection board violated the selection criteria or applicable regulations.

## FACTS

The relevant undisputed facts derive from the administrative record. The Department of Health and Human Services (the "DHHS"), National Institutes of Health ("NIH"), issued a request for proposals ("RFP") on May 22, 2003, to select private-sector service providers to compete against government service providers. The RFP was issued as part of a program, set forth by Office of Management and Budget ("OMB") Circular A–76 (Rev.1999), whereby the cost of government provided Extramural Activities Support Services is compared with private-sector service providers. Included in the RFP were the provisions of the Federal Acquisition Regulation that establish mandatory procedures for a negotiated cost comparison, specifically 48 C.F.R. (FAR) § 52.207–2(a) (2003), which provides:

This solicitation is part of a Government cost comparison to determine whether accomplishing the specified work under contract or by Government performance is more economical. If Government performance is determined to be more economical, this solicitation will be canceled and no contract will be awarded.

As part of the evaluation, a Performance Work Statement (the "PWS") identified the specific support functions studied by the RFP: Administrative Support, Logistical Support, File Management, and IMPAC II and other Data Management. According to the RFP, NIH would evaluate the Government's most efficient organization (the "MEO") against the lowest priced, technically acceptable private-sector proposal. Technical acceptability of the private-sector proposal was determined based on four equally weighted factors: Past Performance, Understanding of the Requirements/Technical Approach, Understanding of Staffing Requirements, and Understanding of Management Requirements.

The RFP directed NIH to award each of the technical factors a rating of "excellent," "good," "marginal," or "poor;" a proposal must rate either excellent or good to be considered technically acceptable. A Source Selection Evaluation Board (the "SSEB") conducted the technical evaluation of plaintiff's proposal. As part of the technical evaluation, the SSEB considered plaintiff's proposal, as well as more than 100 responses to clarification questions posed by NIH. The SSEB determined that plaintiff's proposal was technically unacceptable. In its Final Evaluation Report, the SSEB found that plaintiff's proposal and supplemental responses "revealed major deficiencies in three of the four technical criteria of the RFP, Technical Approach, Staffing, and Management." SSEB Final Evaluation Report, Sep. 2003, at 4. Summarizing its evaluation, the SSEB stated that "the proposal does not demonstrate the necessary level [of] confidence that the offeror could accomplish the desired results within the prescribed standards and workload or could demonstrate the necessary quality of work in providing the required services with an acceptable level of risk to the NIH mission." *Id.* at 5.

Zetherine L. Gore, NIH Contracting Officer, notified plaintiff in a September 24, 2003 letter that its proposal "was not selected for

further consideration and was excluded from the competitive range." Ms. Gore's letter further informed plaintiff that, in accordance with FAR § 52.207–2(a): "No technically acceptable commercial offers or public reimbursable tenders were received to compare against the Agency Tender. The Government's Most Efficient Organization (MEO) will be implemented and the RFP will be canceled."

Plaintiff filed an agency protest of NIH's finding that the proposal was technically unacceptable. NIH denied the agency protest, after which plaintiff filed a protest with the Government Accountability Office's (the "GAO")[1] Comptroller General, which also denied plaintiff's protest. In neither of these previous protests did plaintiff allege that the procurement violated OMB Circular A–76 due to the composition of the SSEB. Plaintiff argues in this proceeding that seven of the eight members of the SSEB held positions in the functions that were the subject of the study and thus had an inherent conflict of interest when evaluating the proposal.

The non-voting chair of the SSEB was Gail L. Gibbons, Project Officer for the proposed contract. The other members of the SSEB were seven voting evaluators: Jean Cahill, Chief Grants Management Officer for the National Human Genome Research Institute ("NHGRI"); Dr. Anne Clark, Chief of the Review Branch for the Division of Extramural Affairs, National Heart, Lung and Blood Institute ("NHLBI"); Dr. William Grace, Deputy Director, National Institute on Drug Abuse ("NIDA"); Donald L. Harne, Management Operations Branch, National Cancer Institute ("NCI"); Michael J. Loewe, Chief Grants Management Branch, Division of Extramural Research, National Institute on Neurological Disorders and Stroke ("NINDS"); Dr. Ann L. Sandberg, Health Science Administrator, Division of Basic and Translational Sciences, National Institute of Dental and Craniofacial Research ("NIDCR"); and Dr. Mary K. Wolpert, Chief of Grants and Contracts Operations Branch, NCI.

The issue before the court is whether any SSEB board members had an improper conflict of interest when evaluating plaintiff's proposal.

## DISCUSSION

### 1. *Jurisdiction and standard of review*

Jurisdiction in the Court of Federal Claims is prescribed by the Tucker Act, 28 U.S.C. § 1491(b)(1) (2000), which allows a protestor to challenge "the award of a contract or any alleged violation of statute or regulation in connection with a procurement or a proposed procurement." The court evaluates the procuring agency's conduct to determine whether the Government's decision was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A); *see Information Tech. & Applications Corp. v. United States*, 316 F.3d 1312, 1319 (Fed.Cir.2003). Thus, two types of challenges may be brought: one testing the substance of the agency's decision and the other testing the procedures mandated by regulation for conduct of the procurement. *See generally Banknote Corp., Inc. v. United States*, 365 F.3d 1345, 1351 (Fed.Cir. 2004).[2]

In order to establish a violation of regulation or procedure, the disappointed bidder must demonstrate a "clear and prejudicial violation of applicable statutes or regulations." *Banknote*, 365 F.3d at 1351 (citations omitted). Where the record establishes no reasonable possibility of competitive prejudice to the protestor, a protest should not be sustained, even if a defect in the procure-

1. On July 7, 2004, the General Accounting Office changed its name to the Government Accountability Office. The agency will be referred to in this opinion as the GAO. *See* Stephen Barr, *GAO Gets New Name, Permission to Launch New Compensation System*, Wash. Post, July 12, 2004, at B2.

2. In its complaint plaintiff also challenged NIH's conduct of the evaluation process, apart from the alleged conflict of interest, on the same grounds that formed the basis of plaintiff's GAO protest. Plaintiff did not raise these additional challenges in its brief or at argument. Accordingly these claims are deemed abandoned. *See Webco Lumber, Inc. v. United States*, 230 Ct.Cl. 457, 465, 677 F.2d 860, 864 (1982); *Ulman v. United States*, 214 Ct.Cl. 308, 314, 558 F.2d 1, 4 (1977).

ment is found. *Statistica v. Christopher,* 102 F.3d 1577, 1581 (Fed.Cir.1996). The Federal Circuit has recognized that "in a negotiated procurement ... the regulations entrust the contracting officer with especially great discretion, extending even to his application of procurement regulations." *American Tel. & Tel. Co. v. United States,* 307 F.3d 1374, 1379 (Fed.Cir.2002).

Before the merits of plaintiff's protest can be considered, plaintiff must show that the error was prejudicial. *Data Gen. Corp. v. Johnson,* 78 F.3d 1556, 1562 (Fed.Cir.1996). The required showing is that there was "a substantial chance it would have received the contract award but for that error." *Alfa Laval Separation, Inc. v. United States,* 175 F.3d 1365, 1367 (Fed.Cir.1999) (citations omitted). Plaintiff's proof should establish that its "chance of securing the award ... [was not] insubstantial," *Information Tech.,* 316 F.3d at 1319, and that a "reasonable likelihood" was present that it would have received the award but for the error, *Data Gen.,* 78 F.3d at 1562.

Plaintiff was the only private-sector provider to submit a proposal. Because plaintiff alleges that a conflict of interest prevented a fair evaluation of its proposal, plaintiff has shown that it would be a qualified offeror on the resolicitation that it asks the court to order. Plaintiff argues that the rejection of its proposal for technical deficiencies was tainted by the putatively biased SSEB. Therefore, the fact that plaintiff cannot show that its proposal was technically sufficient would not affect its eligibility to submit a new proposal on a resolicitation.

Under RCFC 56.1, motions for judgment on the administrative record are reviewed under the same standards as motions for summary judgment. *See Banknote,* 365 F.3d at 1352–53. Summary judgment is proper when no genuine issues of material fact are in dispute and the moving party is entitled to judgment as a matter of law. RCFC 56(c); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). In a case presented on cross-motions for summary judgment based on an administrative record, however, that inquiry is framed by the contents of the record. In the infrequent instance when the record is inadequate or incomplete, and justification is established for going beyond it, the record may be supplemented by additional documents and resolved on the record, as supplemented, or trial may be held, with the trial record superseding the administrative record in whole or part. *See generally Bannum, Inc. v. United States,* 60 Fed.Cl. 718, 724–26 (2004) (discussing development of bid protest review standards). Plaintiff has justified supplementing the record with documents that bear on the existence of a conflict of interest. Not remarkably, this type of evidence would not be found in an administrative record. *See Esch v. Yeutter,* 876 F.2d 976, 991 (D.C.Cir.1989) (allowing supplementation of administrative record when evidence arising after agency action shows whether decision was correct or not).

Plaintiff argues that NIH violated a procurement regulation, OMB Circular A–76, by including on its SSEB individuals who held positions in the function under study, absent compelling circumstances and a written statement of the reasons for their inclusion. In its brief plaintiff asserts: "There is ... no factual dispute that 7 of the 8 members of the SSEB held positions in the function under study." Pl.'s Br. filed Apr. 26, 2004, at 11–12.

Defendant counters that the composition of the SSEB did not require a written statement from the contracting officer because none of the SSEB members held positions in the function under study. The function being studied pursuant to this RFP was Extramural Activities Support Services. According to defendant, this is a limited function that only encompasses the four support areas identified in the PWS: Administrative Support, Logistical Support, File Management, and IMPAC II and other Data Management. Thus, defendant asserts that plaintiff has not shown that any SSEB members held positions corresponding to the function under study, and no conflict of interest resulted.[3]

---

3. Defendant also requests that the court strike exhibits that plaintiff has attached to its com-

plaint and motion for summary judgment. Def.'s Br. filed May 17, 2004, at 29–31. Attached to

2. *Whether the inclusion of certain SSEB members violated an applicable procurement regulation*

OMB Circular No. A–76 sets forth the Government's policy regarding procedures "for determining whether commercial activities should be performed under contract with commercial sources or in-house using Government facilities and personnel." In March 1996 the OMB issued Circular No. A–76 Revised Supplemental Handbook, 61 Fed.Reg. 14338 (Apr. 1, 1996) (the "Handbook"), providing updated guidance and procedures for evaluating the performance of commercial activities. The Handbook itself was updated by the OMB and included Transmittal Memoranda through June 1999.

On August 31, 2000, OMB issued Circular A–76 Transmittal Memorandum No. 22, 65 Fed.Reg. 54568 (Sep. 8, 2000) ("Memo 22"), to implement changes to the Handbook. Relevant to the current dispute was the OMB's change of Handbook Part 1, Chapter 3, ¶ H.3.b to read:

> The Government should establish a source selection evaluation or advisory team. Individuals who hold positions in the function under study should not be members of the team, unless an exception is authorized by the head of the contracting activity. Exceptions will be authorized only in compelling circumstances and, in such cases, the head of the contracting activity shall provide a written statement of the reasons for the action. As a result, OMB has decided to strengthen its longstanding policy limiting such participation, as a better business practice. Individuals who hold positions in an A–76 study should not be members of

the Source Selection Team, unless an exception is authorized by the head of the contracting activity. Exceptions may be authorized only in compelling circumstances and, in such cases, the head of the contracting activity will provide a written statement of the reasons for the action.

Memo 22 at 2.

In addition to revising the text of the Handbook, OMB Memo 22 also included commentary on the policy behind the change. "OMB has been concerned that the use of Federal employees on Source Selection Teams, when those employees are subject to losing their jobs or otherwise being adversely affected by the award of the contract being reviewed by that Source Selection Team, is a poor business practice." *Id.*

The RFP's function under study, as described in the PWS, was support services to three NIH activities: Grants Management, Review Support, and Program. For Grants Management the relevant support functions listed: Administrative Support, Logistical Support, File Management, and IMPAC II and other Data Management. Review Support staff "work on non-scientific, clerical, logistic and data management aspects of each review meeting." PWS at 48. These Review Support activities are specified as Administrative Support, IMPAC II and other Data Management, Meeting Logistics, IC Internal Receipt and Referral, Processing of Assigned Applications and Proposals, and Document Processing and Preparation. As part of the Program activities, the RFP called for Administrative Support, Logistical Support for Conferences and Workshops, IMPAC II and

---

plaintiff's motion are exhibits 37, 38, 40, and 41, which are printouts from NIH's website listing the positions of SSEB board members. Exhibit 42 is an e-mail exchange between the MEO design team co-chair and the consulting firm that conducted the training of SSEB members. Exhibit 39 is a copy of GAO protest decision, *Global Solutions Network Inc.*, B–293336.2, U.S. Comp. Gen. (Apr. 13, 2004).

Decisions from the GAO may be cited be either party as persuasive, albeit non-binding, authority. *See AINS, Inc. v. United States*, 365 F.3d 1333, 1340 n. 5 (Fed.Cir.2004) (holding that GAO determinations do not control court's jurisdictional analysis). Plaintiff has provided the court with a copy of a decision as a courtesy, and it

would be improper to strike it. Furthermore, copies of NIH's website, admissions by the party opponent, are of the type and nature of information that is both relevant to plaintiff's factual allegations of conflict of interest and properly considered by the court. Indeed, defendant states in its Response to Plaintiff's Proposed Findings of Uncontroverted Fact: "We ... do not dispute that the SSEB members held positions as identified by [plaintiff] in the corresponding web sites. Defendant requests that the Court take judicial notice of that information presented in the corresponding web sites." Def.'s Resp. to Pl.'s Prop. Fdgs. of Fact ¶ 21, filed May 17, 2004. The court denies defendant's motion to strike plaintiff's exhibits.

other Data Management, Council–Related Support, and Support for Scientific and Technical Activities. PWS at 63.

Thus, the function under study for all the activities is administrative and technical support, *i.e.*, clerical work such as answering phones, filing and photocopying, and computer data entry. These tasks that are the subject of the RFP are not assigned to the positions that SSEB members currently hold. For example, Dr. Sanberg holds the position of Health Scientist Administrator with the NIDCR, which plaintiff alleges, without further explanation, is a function under study. It is not alleged that Dr. Sandberg's current position entails doing any of the tasks covered in the PWS, such as scheduling meetings or recording the results of those meetings in a database. Plaintiff, instead, alleges a conflict by Dr. Sandberg, and the other SSEB members, simply because they are in the supervisory chain above the individuals who hold positions in the function under study, or because they interact with individuals in the function under study by directing them to schedule meetings, make copies, or enter information into databases.

The fact that SSEB members interact with individuals who hold positions in the function under study, or direct some of their activities, is not sufficient to disqualify the SSEB members. All of the SSEB members who held supervisory positions were responsible for both administrative tasks, which the RFP sought to analyze, and scientific tasks, which were not subject to the RFP. The RFP was not seeking to replace scientific functions, such as reviewing grant applications and monitoring the progress of NIH-funded studies, with a private service-provider; rather, it only sought to determine if out-sourcing ad-

ministrative support tasks would be more economical.[4]

Plaintiff relies on the language in the commentary, rather than the revision to the Handbook itself, to support its position that service by all of the SSEB members, save for Mr. Harne, was improper. This same argument was rejected in *JWK Int'l Corp. v. United States*, 52 Fed.Cl. 650, 659 (2002), *aff'd*, 56 Fed.Appx. 474 (Fed.Cir.2003) (unpubl.). Plaintiff in *JWK* argued that Memo 22 excluded from serving on SSEB's individuals "even if they were in components that only interrelated with or rely upon those under study." *Id.* at 658.

The court failed to adopt plaintiff's reading because "such a far-reaching rule would make it virtually impossible for agencies to use local managers to evaluate centralized functions, such as accounting, budget, systems supports or centralized maintenance." *Id.* The practical effect of adopting this interpretation would be "to bar anyone in the supervisory chain above the function under study from participating in a board." *Id.* at 659.

Plaintiff distinguishes *JWK*, arguing that only one member of the evaluation board held a position in the function under study and that, even if the plaintiff in *JWK* had been deemed technically acceptable, price deficiencies in the proposal would have prevented it from being awarded the contract. In making its distinctions, plaintiff ignores the fact that the court in *JWK* refused to adopt the interpretation of OMB Memo 22 that would have conflicted the remaining board members, the same interpretation which plaintiff is promoting in this protest. After reviewing OMB Circular A–76, the Handbook, and OMB Memo 22, the court refused to exclude "supervisory-type positions in

---

4. To support its allegations, plaintiff submitted the Affidavit of Terry Valladares, July 13, 2004. Defendant objected to the affidavit because it was submitted at 11:30 a.m. on the same day argument was scheduled for 2:00 p.m., and requested an opportunity to respond to it if the court considered it. The court has considered the affidavit, but only insofar as it does not warrant a response by defendant.

Mr. Valladares, plaintiff's Project Manager, described the positions and duties of the seven controversial SSEB members and confirms that those SSEB members supervised both professional and administrative staff in a role with both "scientific and administrative aspects." Valladares Aff. ¶ 4. This affidavit supports the allegation that the SSEB members held supervisory roles within various NIH entities, which included underlying staff members, some of whom were included in and others excluded from the function under study. It does not further the allegation that the SSEB members themselves held positions in the function under study.

components that worked with the ... functions under study," even though the board members were in components that "interrelate with or rely upon those under study." *Id.* at 658.

This court, presented with arguments similar to those made in *JWK*, cannot endorse plaintiff's interpretation, principally because it is not called for by the language of FAR § 52.207–2, the Handbook, or OMB Memo 22, and because, as a practical matter, exclusion of government employees holding similar position to those in this SSEB would be draconian. The only language that plaintiff cites to support such a rule is found in the commentary to OMB Memo 22, which is a commentary, not a reflection of what the applicable regulation disallows. OMB Memo 22 itself only excludes "[i]ndividuals who hold positions in the function under study." For purposes of the RFP, the function under study was Extramural Activities Support Services. Plaintiff does not contend that any of the SSEB members held positions in Extramural Activities Support Services, but that members of the SSEB held positions dealing with Extramural Activities.

Although seven SSEB members held positions within their respective institutes and centers that brought them into contact with Extramural Activities, no applicable regulation or other directive or RFP provision requires the exclusion of these individuals from a SSEB that is considering Extramural Activities Support Services. It is not alleged that any of the seven SSEB members held positions within the four function areas cited in the PWS: Administrative Support, Logistical Support, Management, IMPAC II and other Data Management. Thus, plaintiff has failed to meet its burden of showing that the SSEB members held positions in the function under study, as defined by the applicable procurement regulation.[5]

### 3. *Declaratory relief*

Plaintiff seeks declaratory relief subject to 28 U.S.C. § 1491(b)(2), which authorizes the court to award injunctive and declaratory relief in bid protests. To obtain declaratory relief on a bid protest, plaintiff must succeed on the merits and make a showing similar to that required for injunctive relief: (1) that it will be immediately and irreparably injured; (2) that the public interest would be better served by the relief requested; and (3) that the balance of hardships on all the parties favors the protestor. *See Ranbaxy Pharms., Inc. v. Apotex, Inc.*, 350 F.3d 1235, 1239 (Fed.Cir.2003); *see also Amoco Prod. Co. v. Vill. of Gambell*, 480 U.S. 531, 546 n. 12, 107 S.Ct. 1396, 94 L.Ed.2d 542 (1987) (standard for permanent injunction is essentially same for preliminary injunction, except actual success replaces need to show likelihood of success on merits).

An action at law only allows recovery of "bid preparation costs in a suit for damages, but not loss of anticipated profits," leaving a bid protestor irreparably harmed. *Essex Electro Eng'rs, Inc. v. United States*, 3 Cl.Ct. 277, 287 (1983), *aff'd*, 757 F.2d 247 (Fed.Cir. 1985); *see also Keco Indus., Inc. v. United States*, 203 Ct.Cl. 566, 575 n. 5, 492 F.2d 1200, 1204 n. 5 (1974) (acknowledging existence of damages remedy sometimes reason for denial of injunctive relief in federal district court); *M. Steinthal & Co., Inc. v. Seamans*, 455 F.2d 1289, 1302 (D.C.Cir.1971) (holding that availability of damages, which do not include lost profits, does not warrant automatic dismissal of injunction regardless of strength of claim on merits). Plaintiff's showing that it would be irreparably harmed absent injunctive or declaratory relief, however, does not compensate for its inability to demonstrate the violation of an applicable procurement regulation. The balance of hardships weighs in favor of NIH, which is proceeding on the basis of an MEO, as determined by a properly constituted SSEB.

Finally, while the public interest is served by examination of the type of allegation that

---

5. During argument and in its brief, plaintiff also charged that Ms. Gibbons, Chair of the SSEB and Project Officer for the proposed contract, received confidential information from the MEO. To support this allegation, plaintiff provided a May 9, 2003 e-mail, received by Ms. Gibbons, listing some of the Extramural Activities Support Services contractors and NIH entities that they supported. Plaintiff has not made a showing that the names of the contractors were confidential or that the communication provided Ms. Gibbons with prejudicial information.

plaintiff raises, the court's review has assured that the procurement's evaluation process comported with the applicable regulation concerning prohibited service on an evaluation board. The court fully grasps the conundrum faced by a proposer in plaintiff's position when the members of an evaluation board come from functions with similar names as the MEO activity. Nonetheless, defendant has proved that the functions are not the same.

## CONCLUSION

Accordingly, based on the foregoing,

Defendant's cross-motion for judgment upon the administrative record is granted, and plaintiff's motion is denied. The Clerk of the Court shall enter judgment for defendant.

**IT IS SO ORDERED.**